We have three cases this morning and the first is number 17-2739 United States v. Clark. Mr. Gross and Ms. Van Hook. Thank you. Good morning. I'm Warren Gross and I represent the United States. I'd like to reserve two minutes for rebuttal. That's fine. This court should reverse the order of the district court suppressing essential evidence in this case based on a legal error. The district court found that because Officer Bradley already knew Mr. Roberts' criminal history when he posed the criminal history questions to Mr. Roberts, that those questions could not have advanced the issue. Isn't it more nuanced than that? Judge Wilson said, and I looked at the video, at 1654 she said the traffic stop, the mission of the traffic stop to check things out was over. And shortly after that, you can make an argument that maybe it was really at 1806 when the Officer Bradley was still attempting to check the registration and he was on the phone or on a three-way call with Mr. Roberts' mother, the driver of the car. So at what point, what was the purpose of the traffic stop? It was a traffic stop, right? That's right, Your Honor. And so what you need is some type of reasonable suspicion similar to Terry that there's some other type of criminal activity afoot. What was that suspicion? Your Honor, you only need reasonable suspicion to continue the stop if the officer is no longer fulfilling the mission of the stop and Rodriguez tells us what the mission of the stop is. It's not just an investigation of the traffic offenses that caused the officer to pull the car over. There's other routine matters that are always a component of the traffic stop. Well, there's only two, right? When you say there's always other matters. So I understand, Rodriguez, you can ask about the things that have to do with the stop, that is, the reasonable suspicion or the probable cause that prompted the stop. In this case, the three points that Officer Bradley pointed to that were problematic about the man being on a cell phone, etc., had lights off. But the only other category is officer safety, right? No, Your Honor, that's not correct. What else is there? There is the matter of whether the defendant has a license to operate the car, whether there's a registration. Those are routine matters, you're correct. Those are routine matters that nobody disagrees. Indeed, Rodriguez seems to include that in the basics of the traffic stop. That is, that's part of the traffic stop. Your Honor, my argument is the officer was still engaged in the mission of the traffic stop when he started asking about his criminal record. Correct, Your Honor. Now, we judge this from an objective, not a subjective standpoint, correct? That's right. All right, and at the hearing, and when I say hearing, I should be more specific. There was no hearing in which there was live testimony here, right? That's correct. The court listens to or looks at the video, and then it's argument at the district court, correct? That's correct. All right, at that discussion or that oral argument session, the AUSA says, if I'm not mistaken, quote, the only way that Officer Bradley has in order to test the credibility of Mr. Roberts is to see if he's candid about his record. That's the quote, right? That's right, and Judge, can I just elaborate on that for a moment, if I could? The reason that that is reasonable, and as Your Honor said, it's an objective, reasonable test. The officer at that point knows what Mr. Roberts' criminal history is. Mr. Roberts knows what his criminal history is, but Mr. Roberts may not know that the officer knows what that criminal history is. He's just seen him go back and run a database check, but leave that aside for a minute. When you say it's the only way he has to test it, at this point, he's talking about whether he's got the authority to drive the car. It's a registration question, right? Registration and authority to drive the car. He tells him, the officer knows you've got a license with a certain address. This is registered to somebody who's at that address. He says, it's my mother. The registration shows a woman with the same name. And he gets her on the phone. And he's on the phone with a woman who purports to be his mother. How can the answer, the only way the officer has to test the credibility of Mr. Roberts is to ask about his criminal record, when the person on the phone purports to be his mother, and he knows there's a woman at that address with that name? Well, Your Honor, let me back up for a second. I misspoke when I said that's the only way that he could have tested credibility. But the Supreme Court has said repeatedly, and the case is cited in our brief, that the officer's investigative decisions in the field when he's confronted with incoming information should not be second-guessed by the courts if they're reasonable, if they're objectively reasonable. There's the point, right? That's right. If they're objectively reasonable. If we were to look at this and say, hmm, he knows the things that you and I just discussed. Is it objectively reasonable to believe that when he goes up there after learning that this guy's got a history of drug arrests and starts asking about his arrests, that what he's really thinking is, I wonder if he's got permission to drive this car? Or is it more reasonable to think, hmm, this guy knows now he's got a convicted drug dealer in the vehicle, and he's interested in knowing about drug dealing. He's no longer interested in knowing about, does this guy have authority to drive the car? Your Honor, the objectively reasonable test is not a question of what the officer might be thinking. The Supreme Court said in writ. I agree. I'm not asking that. I'm asking, is it more objectively reasonable looking at that series of events to think, as Judge Wolfson did, this was not about finding out whether this was a car he had permission to drive. This was about finding out about drugs. Your Honor, it is not. Why would Officer Bradley be asking the defendant about his criminal history when he already knows what that history is? How could those questions advance an inquiry into whether this guy is involved with possibly drug dealing? He already knows that the guy is. Isn't the real question, how would that advance the inquiry as to the mission of the stop? Yes, Your Honor, and here's how it does that. Officer Bradley knows that this driver and the registered owner of the vehicle share an address and a last name. But that is not dispositive of whether or not this individual has authority to operate the car at that point. His mother on the phone said between 17-00 and 18-06 that, in fact, he did. Your Honor, she didn't. You have to look carefully at what was said and what was not. First of all, the officer should have asked, if he believed that she didn't say that he had the authority, her son had the authority to drive the car that was registered in her name, then he should have asked her when he was on the three-way phone call. Your Honor, he didn't even know if it was Robert's mother. Robert's, did he ask any question at all to her? Any question at all. He did not. He elected to use another method for testing. Asking about a criminal record. That's right, because, as I explained, that is an objectively reasonable measure of testing Mr. Robert's credibility. Mr. Robert's, at this point, says, I'm authorized to operate this vehicle. Now, the officer, an objectively reasonable officer, would also know these facts. He knows that Mr. Robert's has a prior conviction for drug trafficking. It might be, the officer, an objectively reasonable officer could say, well, perhaps the mother of an adult living with her might authorize her son to drive a car, but it's somewhat less likely that she'd authorize a son with a prior conviction for drug trafficking to operate that vehicle. Objectively reasonable not to talk to the person on the phone who purports to be the mother? Doesn't that undermine severely your assertion that this was all about just figuring out whether he had authority to drive the car? Well, let's leave that for a second. Your reply brief at the very opening begins like this. The district court suppressed essential evidence because of 20 seconds of supposedly off-mission police questioning during an otherwise legitimate late-night traffic stop. That questioning was sandwiched between 30 minutes of appropriate police investigation. Now, when I read that, I wonder, is the government just really bothered by the rule in Rodriguez? No, Your Honor. Isn't Rodriguez saying specifically, assume for the sake of discussion here, that this was off-mission police questioning? Does it matter that it was 20 seconds within 30 minutes? It might not, Your Honor, but the key question here is, Stick with me, Mr. Gross. Does the length of time matter? Is there any such thing as a de minimis violation anymore after Rodriguez? Well, Your Honor, Rodriguez says that there's no de minimis exception. Right. So, if that's true, and if this really was off-mission questioning, assume that for the sake of this part of the discussion, then it doesn't matter, does it, whether it was 20 seconds within 30 minutes? It does matter because the Supreme Court has said in sharp that whether a stop is reasonable depends to some extent on the duration of the stop. But that's not the case here. Okay. But my point is, you said, assume that this is off-mission. Judge Jordan, that's the issue in this case. If I assume it's off-mission... It is. And that's why I'm pressing you on this, because when you say 20 seconds within 30 minutes, you seem to be fighting Rodriguez. Now, I just want to make sure we're not dealing with that. No. We're not dealing with that so that if it was truly off-mission, it wouldn't matter that it was 20 seconds, would it? No. Okay. Okay. And here's why this isn't Rodriguez, Your Honor. Because in Rodriguez, the officer said, I was done with all that. I was done with the mission, I've written the tickets, and now I'm going to conduct a dog sniff. Now, nothing could be more off-mission than a dog sniff, because the dog sniff must necessarily be an investigation of general crimes. The only thing that dog is going to tell the officer is, are there drugs in this car? The usual reason that you would have somebody saying, I needed to check certain things out, might have been if the officer, Bradley, had smelled marijuana on the driver's side, which he clearly said two or three times he had not. If the officer was really fearful of his own safety, which clearly he was not, because the video shows his partner was doing exactly his job as to what he should be doing by going to the right side of the car, the other side. So when you stop someone, you usually have, you ask for a license, registration, insurance, and then you go back and you check if there's any warrants out for that. He goes back and he checks, he sees the person has a record, but there's no warrants. And he's got the license, he's got the insurance, and the mother confirms, or the person who purports to be the mother, that the son, she has the registration, it's in her name, and implies that he's authorized to drive the car. So my question to you again is, at 1806 at the least, isn't the traffic stop over? No, it's not, Your Honor. Your point is that there's something that happened that allows the officer to prolong that stop. That's right. And what is it? It is the officer's authority, as part of every traffic stop, to determine whether or not the driver has authority to operate the car. Why didn't you say, at 1806, if he was really concerned about that,  Your Honor, the woman never, first of all, the woman never said she was the mother, and Judge Wilson pointed out that fact. Our brother Robert says, Mom. And she responds. And she responds. Right. And she never says, he's got authority, he has my permission to operate the minivan. And she is responding to his questions to Mom about why she didn't change the registration. There's a conversation going on, a conversation in which Officer Bradley chooses not to ask one single question about authority to drive the vehicle. Right. And that is because Officer Roberts, not Officer Roberts individually, what his motivation is, but an objectively reasonable officer could take a different tact than questioning someone who is on the phone because the driver called her. There are cases in which an officer finds out, did he have any reason to disbelieve that she was who she purported to? I mean, if you're really finding out, you really want to know whether somebody's got authority to drive a vehicle, and somebody who purports to be the owner of the vehicle is on a phone call, do you think that maybe one question would be asked? Or doesn't the totality of the circumstances, the fact that he asks for nothing, add to the inference that he's not really asking or interested in authority to drive the vehicle? Your Honor, that would be one method of investigating whether this guy has authority. It's not the only objectively reasonable method for investigating. If the officer was so concerned after 1806 with the authority to drive the vehicle, why did he then begin asking about the person's criminal history? He asked the criminal history questions before 1806, Your Honor, and then immediately after asking those questions, he immediately asks a series of questions that could have only been directed to whether or not Mr. Roberts had authority to operate this vehicle. He's asking him again, who's the owner, where does she live, where did you get this car, when did you get it? Those questions are all clearly directed. And Judge Jordan, if the officer was really trying to find out about whether this guy was involved in drug dealing, why doesn't he ask him, as you see in case after case, why doesn't he ask him, do you mind if I search the car? Why doesn't he ever ask him, do you have any drugs in your car? I guess we don't know if we're going to get to that or not, because ultimately he gets what he wants when he goes up to the passenger side. And on that, why don't you read something else from your reply brief? Go ahead. This is from page three of your reply brief. As Officer Bradley explained during the stop, quickly checking a driver's criminal record and then asking the driver about his record is a reasonable way to test the driver's credibility. Here the driver passed that test, thereby satisfying the officer that Roberts had his mother's permission to drive the minivan. So my question to you is, if it's true that he answers the questions to Officer Bradley's satisfaction, Roberts does, and he knows at that point that Roberts had his mother's permission to drive the minivan, what is the reason for approaching the passenger side of the vehicle? Your Honor, he did not know at that point that Roberts had permission. I'm just reading what you guys wrote. What was written is he asked him the questions about the criminal record, the driver passed that test and satisfied that he had his mother's permission. If that's true, there would have been no reason to approach the passenger side of the vehicle, correct? If what was written in your reply brief were accurate, no reason to go to the passenger side of the vehicle, correct? No, Your Honor. Certainly what I meant, and if I didn't make this clear, that I failed the court. But it's true that Roberts accurately answered the questions. And so that led Officer Bradley to say, okay, the guy's not lying to me. But I'm still not satisfied, given the fact that the registration is not in the car, that I can conduct some additional investigation about his authority. And immediately after that, he had the answer. What is taking him to the back of the car and saying, I just want to see if you're lying about where you're coming from, has got to do with whether the mother is telling him the truth on the three-way call with respect to whether the car is registered in her name. And the only thing that's off is the address because she hadn't changed it. Your Honor, he took Mr. Roberts to the back of the car because Mr. Roberts got somewhat agitated. He was exasperated. He was questioning the officer why he was asking these questions. That's why he took him to the back of the car. Your Honor, you are correct. He goes back at 1642, and he starts asking about the criminal record, and he gets answers that conform with the information he's just gotten off of the Internet. And so at 1712, the conversation then goes to the mother as to her registration, and she's talking to the son. The son calls her mom. The officer asks no questions. 1806, the officer still wants to ask other questions, and the son's exasperated. He then takes him to the back of the car, and he says, look, here's what I'm trying to do. I'm just trying to see if you're lying. So this is all about Roberts. And back to Judge Jordan's questions, we don't even until 21 in, because it really started at 942, I believe, so at 2100, he then begins to focus a little bit on Clark. It doesn't make any sense. Your Honor, because he, whether the driver has a full top of the vehicle as part of every mission, the itinerary of the vehicle. You've got to wrestle that one to the ground. If he had concerns about registration, then he had to finish that particular part of the job. And by not asking any additional questions, it indicated that he believed that his mission was accomplished with respect to that particular aspect of his inquiry. No, Your Honor. Rabbi then was entitled to test the answers that Roberts gave about when he got the car, who he got the car from, and why he was out at that time. And that's why he went over and asked Clark. Why not ask the mother? Or the person who purports to be the mother. Your Honor, he decided that he, or, again, an objectively reasonable officer could say, I'm not really willing to rely on the voice of somebody who the defendant called. I don't know whether it's the mother. I don't know whether it's the registered owner. I'm going to go in another direction, and that's objectively reasonable. So the answer to the question basically is, if I inquire about where you're going and where you're coming from and your criminal record, and then I go and talk to whoever else is in the car, and I get a different answer about where you're coming from and where you're going, that's going to tell me whether or not you've got permission to drive this vehicle. That's right, Your Honor. Because that's the best way to find that out. Well, as Judge Wilson found, that was appropriate additional investigation. And, Your Honor, I point out that case after case, including this court in Gavon, says that questions about the driver's itinerary is itself a part of the admission of the traffic stop that can be asked regardless of what the officer's motives are. We're not trying to make a general assessment here of whether that kind of question is okay. We're trying to do what you've agreed is our job, which is on the totality of the circumstances, ask whether it is objectively reasonable to believe that what was going on here was investigating whether there was authority to drive the car or whether what was going on here was something else. Because if it's something else, there's a Fourth Amendment problem, right? Agreed. Okay. I mean, the district judge, Judge Wilson, held that Officer Bradley did not form a reasonable suspicion to extend the traffic stop prior to questioning Roberts about his criminal history. And I don't think you appealed that, challenged that on appeal. What we're challenging is... Basically, what I understand you to be arguing is that the totality of the circumstances establish or give reasonable suspicion for the extension of the stop. What we're challenging, Your Honor, is the district court's holding that the criminal history questions were off mission. This is all about whether or not... Okay, but then it comes back to the logic of what... She held that Officer Bradley did not form a reasonable suspicion to extend the traffic stop prior to questioning Roberts about his criminal history. Right. And you don't challenge that on appeal. I do challenge that. But my main challenge is the officer did not need reasonable suspicion to continue the stop as long as he was still executing the mission of the stop. And Judge Wilson said, well, because he already knew what the answer to those criminal history questions were, he couldn't have been executing the mission of the stop. Therefore, if so facto, he must now be investigating general crime. And as she acknowledges, everything else about the officer's conduct didn't suggest an investigation of general crimes. All of the subsequent questions he asked, including the questions that he asked to Mr. Clark, were to find out if Mr. Roberts was being candid with him when he says, I've got permission to drive this car. And the fact that he has the same name, and that even his mother may be living with him, that an objectively reasonable officer might still want to test to see if he has authority to drive the car because of these factors. At most, prior to 1806, all he had was a possible hunch that there was something else. Correct? In 1806, he still had an objectively reasonable concern that Roberts may be driving this car without authority. And he doesn't need reasonable suspicion, Your Honor, to determine.  Because if he had reasonable questions about the authority to drive that vehicle, then he should very well have questioned the person who purported to be the mother at length, and yet he didn't ask a single question of her. He was looking for something else, the way it appeared to Judge Wilson. And remember, she came in saying, I came in thinking maybe the government's got a good point here. And she changed her mind because, back to her point, the officer did not have a reasonable suspicion to extend the traffic stop prior to questioning Roberts about his criminal history. Can I ask one last question? Absolutely. In the answering brief, your opposing counsel lists in the summary of argument nine factual points.  Things like he confirmed the valid driver's license, no active warrants, the driver told the officer he could not locate the registration. I know there's no dispute about that. But the last point that your opposing counsel makes there is that the officer explained that because of the driver's prior drug arrests, he wanted to know where the driver was coming from. That's what they attribute to Officer Bradley. Is that an accurate statement that Officer Bradley said to Mr. Roberts? He wanted to know about Roberts' prior drug arrests because he, Bradley, wanted to know where Roberts was coming from? I think what Officer Bradley said was, relative to your criminal history, that's why I was asking you where you were coming from. Okay. Now, if I could just follow up on that briefly again. It's an objective test. If you find that the officer wasn't acting in an objectively reasonable manner, that's the end of it. But if Officer Bradley had a subjective motivation to search for general criminal activity but an objectively reasonable officer could still be continuing the mission, then that was no violation of the Fourth Amendment. Understood. It's objective. Thank you very much. Thank you. I'm fine. May it please the Court. Lisa Van Hoge, appearing on behalf of Theodore Clark. I'm here to ask the Court to affirm the lower court's ruling here suppressing the evidence of the gun. And I'd like to start where Judge Jordan, where you left off, and that is with respect to that final point I made in the summary of the argument. And I would direct the Court's attention to the video at 18 minutes after 12 at 14 seconds. And this is when Officer Bradley and the driver are at the rear of the vehicle. And he's, again, explaining what he's trying to do. And Officer Bradley says, I asked you about, well, before he said, I asked you about your criminal history to see if you would lie to me. But what he says is, and this is the best I can do at quoting from the video, relevant to being arrested, I'm trying to figure out where you're coming from. And I think that that speaks volumes, because what that's saying is that. . . Can you follow up by saying I'm trying to confirm if you're lying? Yeah. Can that be read, can it be where you're coming from? Can that be read as simply I'm trying to figure out what you're talking about? I mean, sometimes colloquially people say, so where are you coming from on that? I mean, is this a literal question about where you're coming from physically? Or is this just more of Officer Bradley saying, I'm just trying to figure out if you're lying? I believe it's actually a literal question. He says it two times. He says, I want to know where you're coming from. And then later in the tape he follows up with things. When the driver explains that he picked up Clark at a particular housing development and the officer is using, I think, potters. He's describing it as potters. And the driver is saying, I don't know the name of it, but that's where I picked him up. At one point he says, did you go there to pick up drugs? Let me ask you a question, a legal question, if I could, Ms. Brown. There's a case coming out of the Tenth Circuit, United States v. Cone, that the government relies on. And in that case, the Tenth Circuit says we have somewhat similar facts. There's a question about criminal background. And the defendant in that case says you are improperly prolonging the traffic stop by asking me about my criminal background. And the Tenth Circuit rejects that argument and says, in effect, well if it's proper to run a database check, there's nothing more intrusive about simply asking directly about somebody's criminal background. So what's the flaw in the government's reasoning that everybody agrees we could have run a criminal background check so there's really nothing problematic about asking a criminal background check question to the defendant himself or to the driver himself? I think that the answer is, in the first instance, that at 1654, the mission of the traffic stop should have been over. Officer Bradley should have come to the door with tickets. Instead he asked those questions. Those questions, and there isn't a third sort of case, post-Rodriguez, that says it's okay to ask criminal record questions. It probably is. It probably is. But they go to safety, officer safety. And in this instance, I would look to the Rodriguez that says, while you can undergo a series of questions which go to officer safety, and whether or not someone has a criminal record would be something you might want to either look at via your computer or ask. But there's a temporal limit to safety questions. If there is a temporal limit, what you're saying is, then time does matter. And if time does matter, then what difference does it make if the officer here, Officer Bradley, takes another 20 seconds to ask a question instead of running a second background check? I mean, under what you're saying, he could have run two or three background checks. Right. He could have taken another 20 seconds to run the background check, right? Yes. So if instead of taking another 20 seconds to run the background check, he takes 20 seconds to ask the guy straight up, what's your criminal record? Tell me about it. What's the problem? Well, it's fact specific. And here he did run a background check, which he acknowledges on the video. He says, I ran your background check. So is your argument that as a matter of law, if you run one background check on a computer, that's it? You can't do anything else? Not necessarily. It depends. When I talk about the limit, I'm looking to where Rodriguez said that while you can ask questions that would go to officer safety, you can't use safety-type questions as a means to get around the impermissible detour. And so the mission's already over. So once the mission's over, there's no safety. When you say the mission is over, aren't you putting the rabbit in the hat? That is the question we're trying to get at. Is the mission over? Is it improper? You can't answer the question, is the mission over, by simply asserting the mission is over. The government's proposition is the mission isn't over. And I'm trying to dry out on why is Cone wrong. Is Cone wrong when it says, look, if you can run a background check, you can ask the same questions straight up to the driver. Is that an incorrect statement of the law? And if so, how is it wrong? Why is that illogical or a badly reasoned decision? I don't believe that that's wrong. What I'm arguing is you can only ask safety questions during the mission. So you have to define what the mission is to determine when it's end point, where its end point is. And here the mission is to address the traffic stops and to determine the reason for the traffic stop and determine that he has a valid driver's license, the car is registered, it's inspected, and it's insured. So what is it about this case that makes you say, having run the background check, asking the question is definitely off limits? How do we think about that as a legal matter? How do we, in light of Cone's say, it would be okay to run one background check. Indeed, it would be okay to run two or three background checks because there are other cases that say multiple background checks are fine. But it's not okay to run one background check and ask the question. I think it goes to the purpose of a background check or the question. It's a safety precaution. And safety precautions are only valid during the mission. They're not part of the mission. They are acknowledged as off-mission questions that can ensure the officer's safety. But you can't extend the stop unlawfully to get into officer's safety because it really doesn't make any sense if the actual mission is accomplished. So is your position that if officer safety isn't that issue, then that's not relevant to the totality of the circumstances issue? Yes, it is. And if I could direct Your Honor's attention to the bottom of page 9 and the top of page 10 in my brief, I talk about the cases that have interpreted Rodriguez's holding that safety precautions cannot be used to facilitate investigations into other crimes. And that, in fact, extending the stop unlawfully is inversely related to officer's safety. The same thing would be if the actual traffic mission is complete. And by that I mean we've addressed the violations. And here they're obstructed view. We have something from the rearview mirror hanging. He was on his cell phone and he was delayed in turning on his lights. The car is registered. It's insured. It's inspected. He doesn't have any warrants and he has a valid driver's license. The question about safety is the officer's safety when he's determining all those aspects of the mission. Once it's done, it's far safer to send the driver on his way rather than engage in additional questions because safety is no longer an issue. And here I do think that the question about where you're coming from is literal. I asked about your arrest and relevant to your arrest, which are for drugs, I want to know where you're coming from. And he's talking about did you pick up drugs at Potter's or the drugs in the car. So there were other questions that indicated it was literal. Yes. All right. Assuming you are correct, there's another step here, which is that the results of that additional questioning are the but-for cause of the discovery of the evidence that led to the prosecution of Mr. Clark, right? Yes. How is it that those questions, if we assume there's a constitutional violation, an unlawful prolonging of the traffic stop, how is that the but-for cause of the subsequent arrest or the obtaining of the evidence that was suppressed? Because after the car was unlawfully detained, because it was past the time where the traffic mission was accomplished, it's in that point that the passenger, Mr. Clark, is pulled out of the car and he's frisked. And I think it's apparent that he's saying on the tape he's identifying that he has a gun and where it is. Is it possible to look at this and ask whether there's other discovery that could have, or is that just too much of a guess that walking back and forth through the car, I mean, the car doors are opening on both sides, right? Roberts is getting in and out on the driver's side. Clark gets out or opens the door on the passenger side. Can we say with some certainty that as Officer Bradley walks Roberts back to the car and Roberts gets back in, he's not going to smell the wafting of marijuana coming out of the car? Well, he says that at multiple times on the tape. He says that I did not smell any marijuana until I approached Mr. Clark, who doesn't identify by name, but the passenger. Right, right. I understand that. What I'm saying is he goes and asks the questions of Clark and he does smell it at that point. But assume that that hadn't happened. I'm dealing with the but-for cause here. Kind of an inevitable discovery point, I guess. Assume he keeps talking to Roberts and he walks Roberts back. Whatever was going on inside the car, is it logical to assume that opening the car door, Roberts getting back in, I mean, it's not a bus we're talking about here, it's a vehicle with two people in the front seat. Is it logical to assume or is it probable to assume that had he gone to the driver's side instead of the passenger's side at that point and spent any amount of time, he would have smelled the same marijuana? No. And I say that because he should never have taken the driver out of the car. The stop was already extended beyond the point, its end point. It gets to your point that you say the stop was over. But if we rejected that, would we have to deal with inevitable discovery? Is that something we'd have to address? I think in any case you have to address inevitable discovery, but I don't think that there's anything in the record to suggest that he would have smelled that when he said that he only smelled it when on one side of the vehicle and not the other. Okay. Thank you. I have no questions. Okay. And I have nothing further. Thank you. Thank you. Can I just go through a chronology? A few quick responses if I could. If I may. The officer didn't ask Mr. Roberts to get out of the car in 1806. Roberts said he was confused by the questions. The officer said, look, what I'm trying to do is I'm trying to figure out where you're coming from. I pulled up your history to see if you're lying to me. And he later on said the same thing. This goes on for a couple more minutes. Roberts becomes exasperated. The officer at 2008 asks him to step out of the car, comes to the back, and he says, after they walk back, Bradley explained, I'm asking you questions. Most of them I already know the answer. All you've got to do, and it's kind of inaudible, he's not playing games or anything like that, I told you why I stopped you. I ran your driver's license. I ran for warrants. That's it. So in effect, isn't Bradley saying it's all over with regard to the traffic stop part of it? Now I'm on to something else because he then immediately started asking a series of questions about the passenger car. Now, when he said that's it, I think he's just explaining why it is that he pulled him over. That's not the end of the mission of the traffic stop, so long as an objectively reasonable officer could continue to investigate Mr. Roberts' authority to drive the car. And we've been through it. What was objectively reasonable about asking a person about your pilot that's no warrants, asking a person about his criminal history, and he tells you correctly to the date he got out of prison, and so there's no lies, no further questioning with regard to the authority to drive, it's over. What's this got to do with Clark? Your Honor, the officer is allowed to test the credibility of Mr. Roberts. Mr. Roberts has given an explanation why he's passed. And Roberts was flying colors. But you know what else he's done? He's driving a vehicle around midnight and claiming that he has his mother's permission to do it. Now, isn't it possible, isn't it possible, Judge, if you have an adult child who was recently released from prison for drug trafficking, that you might be leery of letting that child operate your motor vehicle at that hour on a Sunday night? Well, the officer might be concerned. How old was Roberts at the time? He was in his 30s, Your Honor. So he's not a child anymore. He's not a child, which also I think undercuts a little bit the claim that he's operating the car with his mother's permission. I let my high school daughter drive my car when she was living with me. But the mother never controverted that, did she? She never controverted it. She never said, what's he doing with my car? I didn't realize my car was gone. No, she didn't say that. But, Your Honor, let me point to a case that's cited in our brief. It is United States v. Branch. And this is how an officer might go about the method that you talked about. The officer hears the driver say, this is my girlfriend's car. This is her name. She's letting me drive it. The officer then picks up the phone himself. First he finds out from his headquarters who's the registered owner of the car. He gets the phone number for that person. He calls that number up himself. Remember, Your Honor, and this is sort of similar to the advice we get. When someone calls you anonymously. And what did the officer do in Branch? Ask, that's the girlfriend. He calls the phone number, and the driver said, I've got permission to operate this car, but my girlfriend's out of the country. He calls the phone number. He gets the girlfriend's number on the phone. And the mother says, she's not out of the country. She's not out of the country. She's right here. And so then the officer then gets a cell phone number for the girlfriend and calls her and finds out from her. How does that help you, Mr. Gross? Because that's an officer doing things that make sort of sense in terms of finding out if somebody's got permission to drive a car. Here, we've got somebody who purports to be the owner on the phone. No questions are asked. Instead, we have the exchange that Judge Ambrose quoted, including ending with, that's if. And then a bunch of questions about a criminal record. Don't those two lines of discussion or investigation, I should say, seem dramatically different to you? One, I'm finding out by pursuing the people with the registration, whether there's authority to drive the car. And the other, I could talk to the person who purports to be the one who's the registered owner of the car, but I choose not to. Instead, I'm going to ask about criminal history. After I've verified that the person's telling the truth about their criminal history, I'm going to ask some more questions about criminal history. Don't those seem pretty different to you? Now, here's what Officer Bradley could have done if he was following the method that was used in the Branch case. He could have said, okay, you say this is your mother's car. I'm going to find out where your mother lives, what her phone number is. I'm going to call her up at midnight and possibly wake her up and ask her if you've got permission to operate the car. And if he had done that and if the person at the mother's listed phone number had answered and the officer then could be confident that he was actually speaking to the registered owner of the car, that probably would have taken at least as long as the criminal history questions that were asked. So an officer deciding, a reasonably objective officer deciding between those two alternatives could say, look, I've got criminal history information here. This guy knows what it is. Let me just see if he's going to tell me the truth about that. And life was made easy because the person who purported to be the mother was on the phone and the officer had a chance to ask any questions he wanted, and he could have gone on for two or three minutes to question him with regard to the registration, the authority to use the car, and did not. Instead, all he said was, I've checked for everything, including warrants. That's it. Boom. It's over. Right. Now, I'd just like to quickly respond to a couple of points that Ms. VanHook made. One is, she said that Officer Bradley never should have taken Mr. Roberts out of a car. The Supreme Court said in NIMS the officer always has authority in every traffic stop to take the driver out of the car. And whether he takes him out of the car immediately or whether he takes him out subsequently because he thinks that the driver is getting agitated, that's never a Fourth Amendment violation. Ms. VanHook said it always would advance officer safety to just terminate the second. I always thought, at least in some discussions with officers, I realize this is not in the records, the officer oftentimes wants you to stay in the car, and the officer begins to get a little worried if you get out of the car without being asked to get out of the car. Right. That's right. But when the officer makes a determination, he'd rather have this person out of the car because perhaps the time of day, lighting conditions, who else is in the car, that's the officer's call. And the Supreme Court said that the courts can't second-guess that determination and find a Fourth Amendment violation. In the end, all the questions we've asked you with respect to Roberts, this is a case pertaining to Clark, so this is Roberts once removed, and Roberts is given the officer telling him, it's over as to you, why then the about face and then the focus on Clark at 2048? Well, Your Honor, that's assuming that the officer was saying, it's over, I'm done with this entire investigation.  He mentioned it as to Roberts. If he meant that, well, Roberts is the one who's driving the car, and the questions that he asked the Clark, and what does he ask Clark? Does he ask Clark if they're, you know, even though he smells marijuana when he opens the door, does he immediately ask? On the passenger side, three times he said he didn't smell anything on the driver's side. Right, and so doesn't that show, Your Honor, that this guy isn't bound and determined to investigate drug dealing? Wouldn't it have been easy for him to say, you know, I smelled marijuana from the get-go? He didn't do that. He said, I didn't smell marijuana until I opened the passenger side door, and even then, he didn't question Clark about the marijuana. He questioned him about the itinerary. He wanted to see if Clark's version lined up with Roberts' version, so he could make a determination as to whether Roberts was the property driver. At that point, the traffic stop was prolonged, and Rodriguez comes into play. Rodriguez says you can't have any extension, any prolongation of the stop, unless you've got reasonable suspicion once the mission is concluded, and that's the issue that the court has to decide. Where the criminal history question is asked. And the mission was a traffic stop, license, insurance, registration, and warrants. Has the license, has the insurance, doesn't follow up with respect to the registration after the mother was on the line, and sees that there were no warrants. That's it. Well, yes, Your Honor. But my point is, an objectively reasonable officer does not have to decide at that point, I'm done here, I'm confident before I let this individual drive off with this car. This individual who's been convicted of drug trafficking and is driving this car after midnight, am I sufficiently confident that he's got authority to operate this car, even if it's his mother's car? Am I sufficiently confident that he's got authority to operate it, not knowing who the person on the other end of that line is? Well, suspecting that it's his mother, but not knowing, in a way that he would know if he called and registered him. Any good police officer, if he suspected the person wasn't the mother, would have asked some questions that would have delved into that, correct? Well, Your Honor, because he doesn't know who he's got on the phone, he doesn't know whether he can trust the answers. If Roberts had called up someone other than his mother and said, hey, the police have stopped me, they're asking criminal history questions, it's likely that the person he called up would say, oh, okay, and calls her mom before she ever identifies herself. The person on the other end of the line is probably going to play along with Mr. Roberts. But she also would say, why the H are you calling me mom? She might do that. She might do that. But remember, it's Roberts that called her. Yeah. All right. Anyway, thank you very much. Thank you to both counsel for well-presented arguments, and we'll take the matter under advisement.